IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF INDIANA

INDIANAPOLIS DIVISION

KURT KALANI SPARKS,

Individually, as head of household, and as owner of

HAMD Transportation LLC and its associated ventures,

Plaintiff,

v. Case No. 1:26-cv-1193-RLY-MG

STATE OF INDIANA;

GOVERNOR OF INDIANA, in his official capacity;

LIEUTENANT GOVERNOR MICAH BECKWITH,

in his official and individual capacities;

UNITED STATES DEPARTMENT OF VETERANS AFFAIRS;

INDIANAPOLIS VA MEDICAL CENTER (HUD-VASH / TIP PROGRAM);

HVAF OF INDIANA, INC.;

HOOSIER HOMES PROPERTY MANAGEMENT;

REDWOOD CAPITAL INVESTMENTS MIDWEST LLC;

ANNE KNAPKE, in her individual and official capacities;

BOBBY SCHUELKE, in his individual and official capacities;

DANNY "HOON" PARK, in his individual and official capacities;

EMMY HILDEBRANDT, in her official capacity;

CARRIE KINDER, in her individual and official capacities;

OMAR [LAST NAME UNKNOWN], in his individual capacity;

JOHN DOES 1–5, unknown agents or personnel,

Defendants.

---

COMPLAINT AND JURY DEMAND

---

---

PARTIES

Plaintiff

1. Plaintiff Kurt Kalani Sparks is a United States military veteran and the single father of three minor children. He resides in Indianapolis, Indiana, within the jurisdiction of this Court.

2. Plaintiff is the owner and operator of HAMD Transportation LLC, an Indiana-registered business.

3. Plaintiff is also the founder and creator of Active-Session Defense (ASD) and the Phone Guardian PRO1/PRO2 mobile-security platforms, developed under HAMD Transportation LLC.

4. Plaintiff's three minor children each hold a 5% non-voting ownership interest in the family's business ventures, including ASD, for purposes of generational equity and long-term economic stability.

Their identities are withheld pursuant to Fed. R. Civ. P. 5.2(a) and they are referenced only in their capacity as minor equity holders.

5. Plaintiff brings this action individually, as head of household, and as the owner of HAMD Transportation LLC, for harms suffered personally, professionally, economically, and emotionally.

JURISDICTION AND VENUE

6. This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983, the First and Fourteenth Amendments, Title VI of the Civil Rights Act of 1964, the Fair Housing Act (42 U.S.C. § 3601 et seq.), and the Administrative Procedure Act as applicable to federal defendants.

Accordingly, this Court has federal question jurisdiction under 28 U.S.C. § 1331.

7. This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3)–(4), which provides original jurisdiction over civil rights actions seeking redress for the deprivation of constitutional rights under color of state law.

8. To the extent Plaintiff seeks damages or injunctive relief against federal officials in their individual capacities, jurisdiction is proper under 28 U.S.C. § 1331, Bivens v. Six Unknown Named Agents, and related federal common-law doctrines.

9. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367, because those claims arise from the same case or controversy as the federal claims.

10. Venue is proper in the Southern District of Indiana under 28 U.S.C. § 1391(b) because:

- all events giving rise to the claims occurred within this District,
- the property at issue is located in this District,
- the Plaintiff resides in this District, and
- several Defendants reside or conduct business in this District.

11. Declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201–2202 and Ex parte Young, 209 U.S. 123 (1908), as to state officials sued in their official capacities.

12. Plaintiff has standing to bring this action because he has suffered concrete, particularized, and ongoing injuries to his safety, housing stability, civil rights, economic interests, and family well-being, which are traceable to Defendants' actions and redressable by this Court.

## NATURE OF THE ACTION

13. This is a civil-rights action arising from the unsafe housing conditions, discriminatory treatment, cultural and religious insensitivity, administrative misconduct, and retaliatory actions experienced by Plaintiff and his minor children during their participation in the federally funded Transitional in Place (TIP) housing program administered jointly by HVAF of Indiana, Inc. and the United States Department of Veterans Affairs.

14. Plaintiff, a Muslim veteran and single father of three, was placed in a residence that failed to meet basic habitability and safety standards, and repeatedly reported conditions that endangered his family's health, stability, and security. Despite these reports, Defendants failed to take appropriate action, misrepresented material facts, and engaged in conduct that exacerbated the risks to Plaintiff and his children.

15. Plaintiff further alleges that discriminatory attitudes toward his Muslim faith and family structure contributed to disparate treatment, increased scrutiny, and a deterioration in the quality of services provided, in violation of the First and Fourteenth Amendments, Title VI, and the Fair Housing Act.

16. Plaintiff also alleges that statewide discriminatory rhetoric by senior state officials—including public anti-Muslim statements by the Lieutenant Governor—created a hostile climate that influenced service providers and contributed to the harms suffered by Plaintiff, his children, and his family-owned business ventures.

17. Plaintiff seeks declaratory relief, injunctive relief, compensatory damages, punitive damages where permitted, and all other relief necessary to protect his family's safety, civil rights, and economic stability.

FACTUAL BACKGROUND

18. Plaintiff Kurt Kalani Sparks is a United States military veteran and the single father of three minor children. Plaintiff's household practices the Islamic faith, and Plaintiff is the primary caregiver, provider, and head of household.

19. Plaintiff is the owner and operator of HAMD Transportation LLC, an Indiana-registered business, and the founder of Active-Session Defense (ASD) and the Phone Guardian PRO1/PRO2 mobile-security platforms, which were developed under HAMD Transportation LLC as part of Plaintiff's long-term economic-stability efforts.

20. Plaintiff's three minor children each hold a 5% non-voting ownership interest in the family's business ventures, including ASD, for purposes of generational equity and long-term financial stability. Their identities are withheld pursuant to Fed. R. Civ. P. 5.2(a).

21. On or about January 2, 2026, Plaintiff and his children were enrolled in the Transitional in Place (TIP) housing program administered jointly by HVAF of Indiana, Inc. and the United States Department of Veterans Affairs through the Indianapolis VA Medical Center.

22. Plaintiff entered the TIP program with the expectation—based on program materials, staff representations, and HUD-VASH standards—that the program would provide safe, stable, and habitable housing; culturally competent case management; and support for long-term family stability and self-sufficiency.

23. Plaintiff relied on Defendants' representations regarding the suitability of the assigned residence, the adequacy of pre-placement inspections, and the program's commitment to participant safety, nondiscrimination, and Housing First principles.

## INITIAL PLACEMENT AND PRE-MOVE IN FAILURES

24. Plaintiff and his children moved into the assigned residence at 128 N. Colorado Avenue, Indianapolis, Indiana, based on Defendants' assurances that the home met all required safety, habitability, and program standards.

25. Prior to Plaintiff's move-in on January 2, 2026, Defendants represented that the residence at 128 N. Colorado Avenue had been inspected and approved in accordance with TIP program standards, HUD habitability requirements, and VA oversight expectations.

26. Plaintiff relied on these representations and had no reason to believe that the inspection process had been incomplete, inaccurate, or inconsistent with federal program requirements.

27. Upon information and belief, the inspection conducted by Defendants was inadequate, incomplete, or failed to identify conditions that would have rendered the property unsuitable for placement of a veteran household with minor children.

28. Defendants did not provide Plaintiff with any written inspection report, checklist, or documentation verifying that the home met required safety and habitability standards prior to move-in.

29. Plaintiff was not informed of any hazards, deficiencies, or pending repairs at the property before taking possession, nor was he advised of any limitations in the inspection process or any deviations from standard protocol.

30. Defendants did not disclose the property's history of drug activity, prostitution, criminal presence, or environmental hazards, despite these conditions being known or reasonably discoverable through proper inspection and due diligence.

31. Plaintiff and his children entered the home based on Defendants' assurances that the property was safe, habitable, and appropriate for a family with three minor children.

32. Immediately upon move-in, Plaintiff discovered conditions that should have been identified and addressed during any competent inspection, including biohazards, structural deficiencies, and environmental risks, indicating that the pre-placement inspection process was materially deficient.

33. These failures in the initial placement process set the stage for the ongoing safety hazards, health impacts, and instability that Plaintiff and his children experienced throughout their participation in the TIP program

SAFETY HAZARDS AND HABITABILITY FAILURES

34. Immediately after moving into the residence at 128 N. Colorado Avenue, Plaintiff discovered multiple hazardous and unsanitary conditions that should have been identified and corrected during any competent pre-placement inspection.

35. Plaintiff located used hypodermic needles, used condoms, drug paraphernalia, and items consistent with burglary tools inside the home and on the property, indicating prior criminal activity and posing direct health and safety risks to Plaintiff and his minor children.

36. Plaintiff also discovered broken glass, sharp metal fragments, and other debris in areas accessible to his children, creating a risk of physical injury.

37. The home's HVAC system was severely impaired, resulting in inadequate heating and ventilation during winter months and contributing to respiratory distress within the household.

38. The residence lacked a properly installed dryer vent, causing moisture accumulation, mold-risk conditions, and unsafe exhaust dispersal inside the home.

39. Plaintiff observed evidence of pests and infestation, including insects and rodents, which further compromised the home's habitability and sanitation.

40. The surrounding neighborhood exhibited ongoing criminal activity, including visible drug use, prostitution, and violent incidents, which Defendants failed to disclose prior to placement despite these conditions being known or reasonably discoverable.

41. Plaintiff repeatedly notified Defendants of these hazards, providing photographs, videos, and written documentation, yet Defendants failed to take timely or adequate corrective action.

42. The hazardous conditions in the home contributed to significant health impacts on Plaintiff and his children, including respiratory symptoms, sinus infections, and other medical issues requiring clinical evaluation.

43. The cumulative effect of these hazards rendered the residence unsafe, unsanitary, and unfit for occupancy, particularly for a veteran household with minor children, and constituted a violation of HUD habitability standards, TIP program requirements, and Defendants' obligations to ensure participant safety.

MEDICAL HARM AND IMPACT ON CHILDREN

44. Following move-in, Plaintiff's children began experiencing persistent respiratory symptoms, including coughing, wheezing, sinus congestion, and difficulty breathing, which had not been present prior to occupying the residence.

45. Plaintiff's youngest child developed acute respiratory distress severe enough to require emergency medical evaluation, during which medical staff identified environmental factors as a likely contributing cause.

46. Plaintiff's children experienced recurring sinus infections, headaches, and sleep disruption, which Plaintiff reasonably believed were connected to the home's inadequate ventilation, moisture accumulation, and environmental contaminants.

47. Plaintiff himself developed respiratory irritation, sinus inflammation, and sleep disturbance consistent with exposure to poor indoor air quality and environmental hazards.

48. The hazardous conditions in the home, including the lack of proper ventilation, the absence of a functioning dryer vent, and the presence of biohazards and debris, created an environment that posed ongoing health risks to Plaintiff and his children.

49. Plaintiff's children experienced heightened anxiety, fear, and emotional distress due to the unsafe conditions inside the home and the criminal activity occurring in the surrounding neighborhood.

50. The instability and unsafe environment interfered with the children's daily routines, sleep patterns, and educational focus, contributing to behavioral stress and reduced academic engagement.

51. Plaintiff repeatedly informed Defendants of the medical and emotional impacts on his children, including providing updates regarding clinical visits and symptoms, yet Defendants failed to take timely or adequate corrective action.

52. The health and emotional harms suffered by Plaintiff's children were foreseeable consequences of placing a family with minor children in a residence that failed to meet basic safety and habitability standards.

CASE MANAGEMENT MISCONDUCT AND MISREPRESENTATION

53. Throughout Plaintiff's participation in the TIP program, HVAF case management staff—primarily Defendant Anne Knapke—provided inconsistent, contradictory, or incomplete information regarding program requirements, inspection procedures, and the status of repairs and services.

54. Plaintiff repeatedly requested clarification regarding the inspection process, including whether the initial inspection had been completed, whether a follow-up inspection was required, and whether the home had passed or failed any portion of the evaluation. Defendant Knapke provided conflicting explanations that changed over time.

55. On multiple occasions, Defendant Knapke informed Plaintiff that certain repairs or services had been scheduled or completed when, in fact, no such work had been initiated, as later confirmed by vendors or by the absence of any repair activity.

56. Plaintiff later learned that vendor communications had been missed, ignored, or not forwarded, resulting in delays in essential repairs and contributing to ongoing safety and habitability issues.

57. When Plaintiff sought documentation of inspections, repair orders, or case notes, Defendants failed to provide such records, despite program requirements mandating accurate and timely documentation.

58. Defendant Knapke repeatedly reframed Plaintiff's documented reports of hazards, health impacts, and safety concerns as "accusations," "complaints," or "misunderstandings," rather than addressing the underlying issues or escalating them appropriately.

59. Plaintiff's attempts to clarify program expectations, request written records, or obtain updates on repairs were met with defensiveness, minimization, or shifting explanations, which impeded Plaintiff's ability to ensure the safety of his children.

60. Defendant Knapke's inconsistent statements included contradictory explanations regarding:

- whether the inspection was "for safety," "for compliance," or "for documentation,"
- whether the inspection was "routine" or "triggered by concerns,"
- whether repairs were "already approved," "pending approval," or "not required,"
- and whether Plaintiff's reports were "new information" or "already known."

61. These contradictions created confusion, delayed necessary repairs, and undermined Plaintiff's ability to advocate for his children's safety and well-being.

62. Supervisory staff, including Defendants Bobby Schuelke and Danny "Hoon" Park, failed to correct these inconsistencies, failed to ensure accurate documentation, and failed to provide Plaintiff with clear, consistent information regarding program obligations and safety requirements.

63. Defendant Park later restricted Plaintiff's communication channels, directing Plaintiff to limit contact and funnel all concerns through a single point of communication, which further impeded Plaintiff's ability to obtain timely assistance and contributed to a perception of retaliation.

64. The cumulative effect of these misrepresentations, omissions, and administrative failures materially contributed to the unsafe conditions experienced by Plaintiff and his children and hindered their ability to obtain necessary support and remediation.

CULTURAL AND RELIGIOUS BIAS INDICATORS

65. Plaintiff and his children are a Muslim household. Defendants were aware of Plaintiff's religious identity throughout his participation in the TIP program.

66. Early in Plaintiff's participation, Defendant Anne Knapke stated that HVAF "may want to do a story" on Plaintiff's family. Plaintiff reasonably perceived that this interest was connected to the family's visible Muslim identity, including his daughter's wearing of a hijab, and that HVAF sought to publicly present itself as serving "all types of people."

67. HVAF staff repeatedly invited Plaintiff and his children exclusively to Christian-themed events, including Christmas and Easter celebrations, without offering religiously neutral or inclusive alternatives.

68. HVAF staff made unusual efforts to persuade Plaintiff's family to attend a Christian Easter event, including contacting Plaintiff on weekends outside normal communication patterns and emphasizing the importance of their attendance.

69. Plaintiff reasonably believed that staff interest in the family's attendance was connected to the visibility of his daughter's hijab and that HVAF may have intended to use the family's presence for public-facing or promotional purposes. Plaintiff cannot substantiate HVAF's internal motives but can state that this was his perception based on the conduct and context.

70. When Plaintiff declined to attend the Easter event due to work obligations, staff stated that it was acceptable; however, Plaintiff subsequently observed a reduction in responsiveness and support, including delays in previously promised services.

71. HVAF staff provided Plaintiff's children with "leftover" Christmas gifts and encouraged Plaintiff to sign up for a Christmas gift registry, despite knowing that Plaintiff's household does not celebrate Christmas as a religious holiday.

72. Plaintiff repeatedly requested whiteboards for educational use with his children—items that staff, including Defendants Knapke, Schuelke, and Park, stated would be provided. Despite multiple assurances, these items were never delivered, even though Christian-themed gifts and invitations continued.

73. Plaintiff also sought support for employment alignment, including reimbursement or assistance related to a $60 OSHA-10 certification required for a job opportunity with a provider named Jamila. Plaintiff paid for the certification out-of-pocket, but the job placement never materialized, and Defendants provided no follow-through or support.

74. Plaintiff observed that after declining Christian-centric invitations and programming, Defendants became less responsive, less supportive, and more dismissive of Plaintiff's

documented concerns, contributing to delays in repairs, reduced communication, and failures of provision.

75. Plaintiff further observed that staff at times claimed to have completed tasks or provided services that had not actually been performed, including repairs, vendor coordination, and documentation, contributing to Plaintiff's perception that his family's religious identity was affecting the quality of services provided.

76. HVAF staff also monitored Plaintiff's public posts, including posts about the puppy incident and posts where HVAF was mentioned, and responded immediately when HVAF's public image was implicated. Plaintiff reasonably perceived this as part of HVAF's emphasis on public perception and its interest in how his visibly Muslim family appeared in public contexts.

77. These patterns occurred within a program operating as an extension of the VA's arm, giving the impression that participation in Christian-framed activities was favored or expected within the service environment.

78. In combination with statewide anti-Muslim rhetoric by senior state officials, these actions contributed to a hostile and exclusionary environment for Plaintiff's Muslim household and undermined Plaintiff's trust in the neutrality of the program.

79. The cumulative effect of these cultural and religious bias indicators contributed to disparate treatment, reduced access to program benefits, and increased instability for Plaintiff and his children.

IRREGULARITIES AND ADMINISTRATIVE FAILURES

80. Throughout Plaintiff's participation in the TIP program, Defendants provided contradictory explanations regarding the purpose, timing, and results of inspections conducted at the residence located at 128 N. Colorado Avenue.

81. Plaintiff was initially informed that the home had passed inspection and met all required safety and habitability standards. However, subsequent statements by HVAF staff suggested that the inspection was incomplete, informal, or conducted for a different purpose than originally represented.

82. At various times, Defendants described the inspection as:

- a "routine safety check,"
- a "compliance inspection,"
- a "documentation update,"
- or a "follow-up due to concerns,"

with no consistent explanation provided to Plaintiff.

83. Plaintiff was never provided with a written inspection report, checklist, or any documentation verifying that the home met HUD, VA, or TIP program standards, despite repeated requests.

84. Plaintiff was not given advance notice of certain inspections or visits, and in some instances, staff arrived without clear explanation of the purpose or scope of their presence.

85. Plaintiff later learned that certain repairs or safety issues identified during inspections had not been communicated to vendors, had not been documented in case notes, or had not been escalated to supervisory staff.

86. Defendants at times informed Plaintiff that repairs had been "approved," "scheduled," or "completed," when in fact no such work had been initiated, as confirmed by the absence of vendor activity and the continued presence of hazardous conditions.

87. Plaintiff's requests for clarification regarding inspection findings, repair timelines, and program requirements were met with shifting explanations, incomplete information, or defensive responses, preventing Plaintiff from understanding the true condition of the home.

88. Defendants failed to follow standard inspection protocol, including:

- documenting deficiencies,
- issuing written notices,
- verifying habitability standards,
- and ensuring timely remediation of hazards.

89. These administrative failures contributed directly to the persistence of unsafe conditions in the home and impeded Plaintiff's ability to protect his children's health and safety.

90. The inconsistent and undocumented inspection process created confusion, delayed necessary repairs, and undermined the integrity of the TIP program's oversight responsibilities.

RETALIATION AND COMMUNICATION RESTRICTIONS

91. As Plaintiff continued to document safety hazards, health impacts, and administrative inconsistencies, HVAF staff began to characterize Plaintiff's reports as "accusations," "complaints," or "misunderstandings," rather than addressing the underlying issues.

92. Plaintiff's efforts to obtain written documentation, inspection records, or repair updates were increasingly met with defensiveness, delays, or non-responses, in contrast to earlier interactions.

93. After Plaintiff declined to attend the Christian Easter event due to work obligations, Plaintiff observed a reduction in responsiveness and support, including delays in previously promised services and diminished follow-through on program commitments.

94. Defendant Danny "Hoon" Park later instructed Plaintiff to limit communication and to route all concerns through a single point of contact, which materially restricted Plaintiff's ability to obtain timely assistance and created barriers to reporting ongoing hazards.

95. This communication restriction occurred after Plaintiff had raised concerns about safety, habitability, and religious bias, and after Plaintiff had declined participation in Christian-centric programming.

96. Plaintiff reasonably perceived the communication restriction as retaliatory, as it coincided with a decline in staff responsiveness, reduced access to services, and increased difficulty obtaining information necessary to protect his children's safety.

97. Plaintiff also observed that staff became less willing to escalate concerns to supervisors or to document issues in case notes after Plaintiff began requesting transparency and accountability.

98. In several instances, staff asserted that repairs, vendor contacts, or follow-up actions had been completed when, in fact, no such actions had occurred, contributing to Plaintiff's perception that his advocacy was being discouraged.

99. Plaintiff's attempts to clarify program expectations, request written records, or obtain updates on repairs were met with shifting explanations, minimization, or instructions to reduce communication, which impeded Plaintiff's ability to ensure the safety and well-being of his children.

100. The cumulative effect of these actions created a chilling effect on Plaintiff's ability to advocate for his family, as continued documentation or requests for assistance appeared to result in reduced support, increased scrutiny, or further communication restrictions.

101. These retaliatory patterns materially contributed to the persistence of unsafe conditions in the home and undermined the integrity of the TIP program's obligation to provide safe, stable, and nondiscriminatory support to veteran households.

IMPACT ON PLAINTIFF'S BUSINESS (HAMD TRANSPORTATION, HAMDS HANDY REFERRALS, ASD, PHONE GUARDIAN, CONTENT CREATION, AND FAMILY ENTERPRISES)

102. Plaintiff is the owner and operator of HAMD Transportation LLC, the founder of Active-Session Defense (ASD) and the Phone Guardian PRO1/PRO2 mobile-security platforms, and the creator of multiple family-based content and business ventures, including HAMDS Handy Referrals, YouTube and TikTok monetization efforts, and early-stage submissions for Apple tech modeling for his children.

103. Plaintiff's business model includes transportation services, software development, cybersecurity innovation, content creation, educational media, and family-based branding, all of which require stability, reliable scheduling, and a safe environment conducive to work and production.

104. Plaintiff and his children also began developing monetized content for YouTube and TikTok, including educational videos, family-based content, and promotional materials

related to ASD and Phone Guardian PRO. These efforts required consistent filming conditions, stable routines, and uninterrupted work time.

105. Plaintiff additionally began developing HAMDS Handy Referrals, a community-based service platform intended to generate supplemental income and expand the HAMD brand.

106. Plaintiff's children participated in photography sessions and casting submissions for potential Apple tech modeling opportunities, which required preparation, scheduling, and stable home conditions.

107. The unsafe and unstable conditions at the residence, including environmental hazards, respiratory illness among Plaintiff's children, and repeated medical disruptions, significantly interfered with Plaintiff's ability to maintain regular work hours, film content, or pursue business development.

108. Plaintiff's time and attention were repeatedly diverted to addressing safety hazards, coordinating repairs, managing health impacts, and attempting to obtain accurate information from HVAF staff, reducing the time available for business operations and content production.

109. Plaintiff experienced delays in the development and deployment of ASD and Phone Guardian PRO2 due to the instability caused by unsafe housing conditions and the lack of consistent program support.

110. Plaintiff's ability to pursue transportation-based income through HAMD Transportation LLC was impaired by:

- repeated medical appointments for his children,
- sleep disruption caused by environmental hazards,
- and the need to remain at home to address unresolved safety issues.

111. In a meeting with Defendant Bobby Schuelke, HVAF staff attempted to discourage Plaintiff from continuing to build HAMD Transportation, asserting that Plaintiff "could not do it" and that his efforts were misguided. Plaintiff reasonably perceived this as an attempt to undermine his self-sufficiency and business development.

112. Notes and communications from this period reflect HVAF's discouragement of Plaintiff's entrepreneurial efforts, including attempts to redirect Plaintiff away from building HAMD Transportation despite its viability and alignment with Plaintiff's long-term stability goals.

113. Plaintiff's efforts to align with employment opportunities, including the OSHA-10 certification required for a potential job lead, were hindered by Defendants' failure to provide promised support, follow-through, or reimbursement. Plaintiff paid for the certification out-of-pocket, but the job opportunity did not materialize due to lack of program support.

114. Plaintiff's ability to produce educational content, technical documentation, and business materials was further hindered by Defendants' failure to provide promised educational tools, including whiteboards needed for homeschooling, business planning, and content production.

115. The instability caused by Defendants' actions also affected the 5% non-voting equity interests held by Plaintiff's minor children in the family's business ventures, as delays in ASD development, reduced content output, and interruptions to HAMD Transportation directly impacted the long-term value of those equity stakes.

116. The cumulative effect of these disruptions resulted in lost income, lost business opportunities, delayed product development, interrupted content creation, and economic harm to both Plaintiff and the family-owned business entities.

117. These business-related harms were foreseeable consequences of placing Plaintiff's family in unsafe housing, discouraging Plaintiff's entrepreneurial efforts, failing to provide promised support, and restricting communication in a manner that impeded Plaintiff's ability to maintain stable employment and business operations.

EXTERNAL STRESSORS AND LAW ENFORCEMENT INCIDENT

118. During the period of instability caused by unsafe housing conditions, inconsistent program support, and reduced responsiveness from HVAF staff, Plaintiff and his children experienced additional external stressors that compounded the family's emotional and psychological burden.

119. On or about the date of the incident, Plaintiff was stopped by a Fayette County Sheriff's Deputy while returning from work. During the stop, Plaintiff repeatedly informed the deputy that he urgently needed to use the restroom due to a basic human need.

120. The deputy refused Plaintiff's requests to use a restroom, despite a public restroom being located nearby, and escalated the encounter in a manner Plaintiff experienced as aggressive, unnecessary, and disproportionate to the circumstances.

121. As a result of the deputy's refusal, Plaintiff was forced to urinate on himself during the traffic stop, causing significant humiliation and distress. Plaintiff's minor children were on the phone with him during the incident and witnessed the event in real time.

122. The deputy claimed to have "paced" Plaintiff's vehicle to justify the traffic citation. Plaintiff later identified technical inconsistencies in the deputy's account, including the absence of documented pacing training, lack of calibration records, and lack of evidence supporting the deputy's stated method of speed determination.

123. Plaintiff filed a grievance with the sheriff's office regarding the deputy's conduct. The agency declined to investigate further, stating that the alleged speed was "so egregious" that they were not reviewing the remainder of the incident, despite Plaintiff's documented concerns regarding the deputy's conduct and the denial of a basic human need.

124. Plaintiff informed HVAF staff, including Defendant Bobby Schuelke, of the incident, the technical inconsistencies, and the emotional impact on his children. Defendant Schuelke advised Plaintiff to "let it go" and discouraged Plaintiff from addressing the matter through technical or procedural channels.

125. Defendant Schuelke further suggested that Plaintiff should have framed the incident solely as a "basic human need" issue rather than raising concerns about the deputy's conduct, training inconsistencies, or procedural violations, despite Plaintiff's explanation that courts typically require technical evidence to challenge a citation.

126. HVAF did not offer support, advocacy, or assistance following the incident, nor did staff acknowledge the severity of the humiliation or the impact on Plaintiff's children.

127. The law enforcement encounter occurred during a period in which Plaintiff was already managing significant stress related to unsafe housing conditions, repeated medical issues affecting his children, and inconsistent support from HVAF staff, compounding the family's emotional strain.

128. The cumulative effect of unsafe housing, reduced program support, and external stressors—including the law enforcement incident and HVAF's dismissive response—materially contributed to the emotional, psychological, and developmental strain experienced by Plaintiff and his children.

ESCALATION ATTEMPTS, LEADERSHIP AWARENESS, AND RETALIATORY OBSTRUCTION

129. Plaintiff made repeated good-faith efforts to escalate concerns regarding unsafe housing conditions, administrative inconsistencies, religious bias indicators, and program failures through every available internal and external channel.

130. Plaintiff initially reported concerns to his assigned caseworker, Anne Knapke, providing photographs, videos, written descriptions, and medical updates documenting the hazards affecting his children.

131. When conditions did not improve, Plaintiff escalated concerns to Tina Strayer, who was identified as a staff member adjacent to the employment and support functions of the program.

132. Plaintiff subsequently escalated concerns to Defendant Bobby Schuelke, providing detailed accounts of inspection irregularities, delays in repairs, religious bias indicators, and the emotional and medical impact on his children.

133. When issues persisted, Plaintiff escalated concerns to Defendant Danny "Hoon" Park, the Program Director, informing him of the ongoing hazards, the lack of documentation, the reduction in services, and the retaliatory communication restrictions.

134. Plaintiff later escalated concerns to Emma Hildebrandt, a higher-level HVAF representative, providing a comprehensive summary of the unresolved safety issues, administrative failures, and the impact on his family.

135. When internal escalation produced no meaningful corrective action, Plaintiff included Carrie Kinder, the VA liaison assigned to the TIP program, informing her of the unsafe conditions, the administrative failures, and the religious bias indicators.

136. After continued inaction, Plaintiff escalated the matter to Congressman André Carson's office, specifically communicating with Heather Harvey, providing documentation

of the unsafe housing, administrative misconduct, and the lack of corrective action by HVAF and the VA liaison.

137. Throughout this process, Plaintiff also sought guidance from members of his spiritual and community network, consulting individuals knowledgeable about social work, institutional behavior, and veteran support systems to determine whether he was misunderstanding the situation or whether the agency's conduct was improper.

138. Despite escalating concerns through every available channel, HVAF staff began to restrict communication, instructing Plaintiff to limit contact, reducing responsiveness, and creating barriers to reporting hazards or obtaining assistance.

139. HVAF failed to list Plaintiff as an authorized contact for vendors, resulting in vendors being unable to reach him directly. Vendors were required to contact the caseworker instead, and the caseworker failed to respond promptly, then blamed Plaintiff for "not being in contact," despite Plaintiff having no ability to communicate with vendors directly.

140. HVAF repeatedly failed to pay bills on time, causing service disruptions and instability. When questioned, staff provided shifting explanations, including blaming the mail system, despite Plaintiff's repeated requests for timely and documented payment processing.

141. Plaintiff observed that after raising concerns, HVAF staff became increasingly hostile. During pantry visits, staff made rude or dismissive comments toward Plaintiff and his children, including comments implying poor parenting when Plaintiff's son mentioned hair breakage. These interactions contributed to a hostile and unwelcoming environment.

142. Plaintiff reasonably perceived that the hostility and insinuations were connected to his family's Islamic identity and to his continued advocacy for safe housing and proper program administration.

143. When Plaintiff submitted a FOIA request, Defendant Park stated that he "could not produce conversations between caseworkers," implying the existence of internal communications that were inappropriate, unprofessional, or damaging, yet refusing to disclose them.

144. Plaintiff observed that the more he documented hazards, requested transparency, or escalated concerns, the more HVAF staff reduced services, restricted communication, delayed repairs, and increased administrative obstacles.

145. Leadership at multiple levels of HVAF and the VA liaison's office were fully aware of the issues, yet failed to intervene, failed to provide documentation, and failed to remedy the underlying safety, religious neutrality, or administrative problems.

146. Plaintiff's escalation efforts demonstrate diligence, responsibility, and good-faith attempts to resolve the issues internally and through appropriate oversight channels, and they establish that Defendants had full knowledge of the harm yet failed to act and, in several respects, made conditions worse.

CUMULATIVE IMPACT AND FORESEEABILITY

147. The harms suffered by Plaintiff and his children did not occur in isolation. They were the cumulative and foreseeable result of a series of interconnected failures, omissions, and retaliatory actions by HVAF staff and leadership, acting under color of federal authority through the TIP program.

148. Defendants placed Plaintiff's family in unsafe and uninhabitable housing, failed to conduct proper inspections, failed to disclose known hazards, and failed to remediate dangerous conditions, creating an environment that predictably resulted in medical harm, instability, and emotional distress.

149. Defendants' inconsistent, contradictory, and undocumented administrative actions — including misrepresentations about inspections, repairs, and vendor coordination — foreseeably prolonged exposure to hazardous conditions and impeded Plaintiff's ability to protect his children's health.

150. Defendants' religiously biased conduct, including pressure to attend Christian events, Christian-centric programming, and reduction in services after Plaintiff declined such events, foreseeably created a hostile environment for Plaintiff's Muslim household and contributed to emotional and psychological harm.

151. Defendants' retaliatory actions — including communication restrictions, reduced responsiveness, delayed bill payments, failure to list Plaintiff as a vendor contact, and hostile treatment during pantry visits — foreseeably increased instability, impeded access to services, and exacerbated the harm caused by unsafe housing.

152. Defendants' discouragement of Plaintiff's business development efforts, including attempts to dissuade him from building HAMD Transportation LLC and failure to support employment alignment, foreseeably caused economic harm, lost opportunities, and delays in the development of ASD, Phone Guardian PRO2, and related family enterprises.

153. Defendants' failure to provide promised educational tools, including whiteboards necessary for homeschooling and business planning, foreseeably disrupted Plaintiff's children's education and impeded content creation and business operations.

154. Defendants' refusal to provide transparency, including failure to produce inspection reports, repair documentation, or internal communications, foreseeably prevented Plaintiff from understanding the true condition of the home and from taking protective measures for his family.

155. The law enforcement incident — including the denial of a basic human need, the humiliation suffered, and the trauma experienced by Plaintiff's children — occurred during

a period of heightened instability caused by Defendants' failures, and Defendants' dismissive response foreseeably compounded the emotional and psychological harm.

156. Plaintiff's repeated escalation attempts — to caseworkers, supervisors, the Program Director, the VA liaison, and ultimately a congressional office — placed Defendants on clear notice of the ongoing harm, yet Defendants failed to intervene and, in several respects, worsened the conditions.

157. The cumulative impact of Defendants' actions and omissions resulted in a foreseeable chain of harm, including medical injury, emotional distress, economic loss, educational disruption, business interference, and long-term developmental impact on Plaintiff's children.

158. Defendants' conduct, taken as a whole, demonstrates a pattern of negligence, discrimination, retaliation, and administrative misconduct that foreseeably caused the full scope of damages suffered by Plaintiff and his family.

State Administrative and Policy Environment Linking HVAF to the Lieutenant Governor's Office

159. Plaintiff further alleges that HVAF of Indiana's conduct occurred within a foreseeable administrative environment shaped by the Office of the Lieutenant Governor and its faith-based policy initiatives.

160. As Lieutenant Governor, Micah Beckwith serves as Chair of the Indiana Housing and Community Development Authority (IHCDA), the state agency responsible for allocating federal and state housing funds, including HOME-ARP and Housing First awards from which HVAF directly benefits.

161. During 2025 and 2026, IHCDA—under Beckwith's chairmanship—approved multiple funding streams and program awards supporting HVAF's operations. Public reporting from

Beckwith's office confirms his active role in renegotiating, discontinuing, or adjusting social-service contracts, demonstrating discretionary oversight of nonprofit providers operating under state-linked funding structures.

162. In February 2026, Governor Mike Braun issued Executive Order 26-06 establishing the Faith-Based Institutions Initiative and designating Lieutenant Governor Beckwith to lead the program. The initiative expressly seeks to expand collaboration between state government and faith-based organizations in the delivery of social services, including housing, addiction recovery, and mental-health programs.

163. Beckwith has publicly advocated for integrating "Judeo-Christian ethics" into governance and has stated he sees "little distinction" between his pastoral role and his governmental role. These statements, combined with his budget requests for millions in "faith-based initiatives," reflect an official policy environment that favors faith-aligned service providers.

164. HVAF leadership has participated in statehouse events, legislative advocacy sessions, and public ceremonies where Beckwith's policy priorities were discussed, promoted, or implemented. HVAF's visibility within these forums places the organization within the same administrative and ideological framework advanced by the Lieutenant Governor's office.

165. State agencies overseen by the Lieutenant Governor—including IHCDA, the Office of Community and Rural Affairs (OCRA), and the Indiana Department of Veterans Affairs (IDVA)—have publicly identified HVAF as a key partner in veteran housing and service delivery. These agencies operate under the administrative authority of the Lieutenant Governor and routinely coordinate with HVAF.

166. These facts establish foreseeability: HVAF's discriminatory treatment of Plaintiff's Muslim family did not occur in isolation but within a state-endorsed climate that incentivized alignment with faith-based and "value-based" preferences articulated by the Lieutenant Governor. This environment created predictable pressure on state-funded providers—including HVAF—to conform their conduct to the ideological priorities of the administration.

167. Accordingly, Plaintiff asserts that HVAF's actions were influenced by, and occurred under, the color of state authority, supporting Plaintiff's claims under the First and Fourteenth Amendments and 42 U.S.C. § 1983.

168. HVAF of Indiana operates within a framework of direct state oversight, including annual compliance reviews conducted by the Indiana Housing and Community Development Authority (IHCDA) for Housing First and HOME-ARP grant funds. These reviews include site inspections, habitability verification, and corrective-action monitoring, placing HVAF under ongoing state-administered supervision.

169. As a recipient of more than $750,000 in federal pass-through funds, HVAF is subject to Single Audit requirements under 2 C.F.R. Part 200, which are reviewed by state pass-through agencies including IHCDA and the Indiana Department of Veterans Affairs (IDVA). This audit structure creates a direct accountability relationship between HVAF and state agencies overseen by the Lieutenant Governor.

170. HVAF is required to use state-mandated data and reporting systems, including the Homeless Management Information System (HMIS) administered by IHCDA, and must complete state-issued HMIS training and compliance protocols. HVAF also utilizes state-integrated case-management procedures for the Transition in Place (TIP) program, coordinated through IDVA and the VA.

171. HVAF participates in state-run operational structures such as the Indiana Balance of State Continuum of Care (CoC), monthly state-hosted webinars, and coordinated-entry systems that determine service eligibility and resource allocation. These systems are administered or overseen by state agencies under the authority of the Lieutenant Governor.

172. HVAF's housing developments and service programs—including Proctor Place, Housing First placements, and TIP operations—are funded, monitored, or supported through IHCDA, IDVA, and OCRA, all of which operate under the administrative leadership of the Lieutenant Governor. This integration places HVAF within the state's operational chain of command for veteran housing and homelessness services.

173. Through this combination of state audits, mandated data systems, compliance requirements, coordinated-entry participation, and state-funded program integration, HVAF functions as an operational extension of state-administered housing and veteran-service systems. Accordingly, HVAF's conduct toward Plaintiff occurred within a structure of state oversight and is fairly attributable to the State of Indiana for purposes of 42 U.S.C. § 1983.

FINAL DAMAGES SUMMARY

174. As a direct and proximate result of Defendants' actions and omissions, Plaintiff and his minor children suffered multiple categories of compensable harm, including physical injury, emotional distress, economic loss, educational disruption, business interference, and long-term developmental impact.

175. The damages asserted below are reasonably foreseeable, supported by the factual record, and fall within the categories recognized under federal civil rights law, tort law, and constitutional litigation.

I. Physical and Medical Damages

176. Plaintiff's children experienced respiratory illness, sinus infections, and related medical conditions caused or exacerbated by unsafe housing conditions, including environmental hazards and inadequate remediation.

177.. Plaintiff incurred medical expenses, including doctor visits, medications, and follow-up care, directly attributable to Defendants' failure to provide safe and habitable housing.

178.. Plaintiff and his children experienced sleep disruption, fatigue, and physical discomfort resulting from prolonged exposure to unsafe conditions.

II. Emotional and Psychological Damages

179. Plaintiff's children experienced fear, anxiety, and emotional distress due to unsafe housing, repeated medical issues, and instability caused by Defendants' failures.

180. Plaintiff suffered humiliation and emotional trauma during the law enforcement incident, including the denial of a basic human need and the resulting involuntary urination, which occurred while his children were on the phone and witnessed the event in real time.

181. Plaintiff and his children experienced emotional distress due to hostile treatment by HVAF staff, including rude comments, insinuations of poor parenting, and religiously coded disrespect.

182. Plaintiff experienced ongoing stress, frustration, and psychological strain due to Defendants' retaliation, communication restrictions, and administrative obstruction.

III. Economic Damages

183. Plaintiff suffered lost income due to disruptions in his ability to operate HAMD Transportation LLC, including missed work opportunities, inconsistent scheduling, and the need to remain home to address unresolved hazards.

184.. Plaintiff experienced delays in the development and deployment of Active-Session Defense (ASD) and Phone Guardian PRO2, resulting in lost business opportunities and reduced market momentum.

185. Plaintiff and his children experienced interruptions in content creation for YouTube, TikTok, and HAMDS Handy Referrals, resulting in lost monetization opportunities and reduced audience growth.

186. Plaintiff's children lost potential modeling and casting opportunities due to instability, scheduling disruptions, and the inability to maintain consistent routines.

187. Plaintiff incurred out-of-pocket expenses, including the cost of the OSHA-10 certification, which was purchased in reliance on program support that was never provided.

188. Plaintiff's children's 5% non-voting equity stakes in family business ventures were harmed due to delays in product development, reduced content output, and disruptions to business operations.

VI. Innovation, Public-Safety, and Future Economic Damages

Plaintiff suffered long-term economic harm and loss of future earning capacity due to the disruption and delay of his ongoing development of Active-Session Defense (ASD) and the Phone Guardian PRO2 platform, including lost innovation momentum, reduced market positioning, diminished licensing potential, and loss of alignment with public-safety and child-protection technology priorities. Defendants' conduct foreseeably impeded the

advancement of technology designed to protect vulnerable users and the general public, resulting in both economic loss and harm to the public interest.

V.. Educational and Developmental Damages

189. Plaintiff's children experienced educational disruption due to unsafe housing, medical issues, and the failure of HVAF to provide promised educational tools, including whiteboards necessary for homeschooling and structured learning.

190.. The instability caused by Defendants' actions interfered with the children's developmental routines, emotional regulation, and academic progress.

VI. Programmatic and Administrative Damages

191.. Plaintiff suffered harm due to Defendants' failure to provide safe housing, failure to conduct proper inspections, failure to disclose hazards, and failure to remediate dangerous conditions.

192.. Plaintiff suffered harm due to Defendants' misrepresentations regarding repairs, inspections, vendor coordination, and program requirements.

193.. Plaintiff suffered harm due to Defendants' retaliatory communication restrictions, reduced responsiveness, delayed bill payments, and administrative obstruction.

194. Plaintiff suffered harm due to Defendants' refusal to provide transparency, including failure to produce inspection reports, repair documentation, or internal communications.

VII. Constitutional and Civil Rights Damages

195. Plaintiff suffered harm due to violations of his First Amendment rights, including interference with religious exercise and retaliation for protected activity.

196. Plaintiff suffered harm due to violations of his Fourteenth Amendment rights, including deprivation of safe housing, unequal treatment, and arbitrary administrative conduct.

197. Plaintiff suffered harm due to violations of 42 U.S.C. § 1981, including discrimination in the making and enforcement of contracts and unequal access to program benefits.

VIII. Punitive Damages

198. Plaintiff asserts that punitive damages are warranted where permitted by law, based on Defendants' reckless disregard for the safety and rights of Plaintiff and his children, religious discrimination, retaliatory conduct, and deliberate indifference to known hazards.

IX. Summary

199. The totality of damages asserted herein reflects the cumulative impact of Defendants' conduct, which foreseeably caused physical injury, emotional distress, economic loss, educational disruption, business interference, and long-term developmental harm to Plaintiff and his minor children.

**State-Level Discriminatory Climate and Foreseeability**

1. Plaintiff's claims arise within a broader statewide context in which senior elected officials, including the Lieutenant Governor of Indiana, have made public statements that Plaintiff reasonably perceived as hostile toward Muslims and Islam.

2. The Lieutenant Governor's statements were widely disseminated, unambiguous in tone, and conveyed a message that Muslims are inherently suspect, untrustworthy, or culturally incompatible with the values of the state.

3. Plaintiff reasonably believes that these statements reflect and reinforce the discriminatory posture of the current state administration, including the Governor, whose public alignment with the Lieutenant Governor's rhetoric has contributed to a statewide climate of hostility toward Muslim residents.

4. Plaintiff asserts that such rhetoric, when issued by high-ranking state officials, foreseeably influences the behavior of downstream actors — including service providers, caseworkers, and contracted agencies — who operate within the cultural and political environment shaped by state leadership.

5. Plaintiff reasonably believes that the discriminatory climate created by state leadership emboldened HVAF staff to engage in religiously biased conduct, including Christian-centric programming, pressure to attend Christian events, and reduced services after Plaintiff declined such events.

6. Plaintiff further asserts that the discriminatory climate contributed to HVAF staff's willingness to treat Plaintiff's advocacy, documentation, and requests for transparency as adversarial or unwelcome, rather than as legitimate efforts to protect his children.

7. Plaintiff reasonably believes that the statewide climate of hostility toward Muslims influenced the dismissive and unsupportive response he received after the law enforcement incident, including the denial of a basic human need and the humiliation he suffered during the traffic stop.

8. Plaintiff asserts that the discriminatory climate created by state leadership was a foreseeable contributing factor to the harms he and his children experienced, including

unsafe housing, reduced services, retaliatory conduct, and hostile treatment by HVAF staff.

9. Plaintiff's claims therefore include not only the direct actions of HVAF staff, but also the broader discriminatory environment fostered by state officials whose rhetoric materially contributed to the conditions under which HVAF staff operated.

CAUSES OF ACTION

1. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.
2. The following constitutional violations arise directly from the conduct described in the preceding factual allegations.

3. Defendant HVAF acted under color of state law because its housing, case-management, and TIP program operations were carried out within a framework of state-mandated audits, data systems, compliance requirements, and administrative oversight administered by IHCDA and IDVA under the authority of the Lieutenant Governor. HVAF's conduct toward Plaintiff is therefore fairly attributable to the State of Indiana under the doctrines of entwinement, delegated public function, and joint participation

First Amendment – Free Exercise (42 U.S.C. § 1983)

1. Defendants, acting under color of federal authority through the TIP program, interfered with Plaintiff's right to freely exercise his Islamic faith by promoting Christian-centric programming, pressuring attendance at Christian events, and reducing services after Plaintiff declined such events.

2. Defendants' conduct lacked religious neutrality and placed a substantial burden on Plaintiff's ability to practice his faith without penalty or adverse treatment.

3. Defendants' actions constitute a violation of Plaintiff's rights under the First Amendment to the United States Constitution.

First Amendment – Retaliation (42 U.S.C. § 1983)

1. Plaintiff engaged in protected activity by documenting hazards, requesting transparency, asserting his religious boundaries, filing grievances, and escalating concerns to supervisory staff and oversight bodies.

2. Defendants retaliated against Plaintiff by restricting communication, reducing services, delaying repairs, failing to pay bills on time, refusing to list Plaintiff as a vendor contact, and treating Plaintiff and his children with hostility.

3. Defendants' retaliatory conduct would deter a reasonable person from exercising their constitutional rights and therefore violates the First Amendment.

Fourteenth Amendment – Substantive and Procedural Due Process (42 U.S.C. § 1983)

1. Defendants deprived Plaintiff and his children of their right to safe, habitable housing and failed to follow required procedures for inspections, documentation, remediation, and communication.

2. Defendants' arbitrary and inconsistent administrative actions, including misrepresentations about repairs and inspections, deprived Plaintiff of fair process and placed his children at risk of physical harm.

3. Defendants' conduct constitutes a violation of Plaintiff's substantive and procedural due process rights under the Fourteenth Amendment.

Fourteenth Amendment – Equal Protection (42 U.S.C. § 1983)

1. Plaintiff and his children were treated differently from similarly situated program participants due to their Islamic faith and cultural identity.

2. Defendants' Christian-centric programming, pressure to attend Christian events, and reduction in services after Plaintiff declined such events constitute discriminatory treatment without a legitimate governmental purpose.

3. Defendants' conduct violates the Equal Protection Clause of the Fourteenth Amendment.

Civil Rights Act – Discrimination in Contracting (42 U.S.C. § 1981)

1. Plaintiff entered into contractual relationships and programmatic agreements through the TIP program, including housing, employment support, and service delivery.

2. Defendants interfered with Plaintiff's ability to make and enforce these contracts on equal terms due to religious discrimination, administrative obstruction, and retaliatory conduct.

3. Defendants' actions constitute a violation of 42 U.S.C. § 1981.

Negligence

1. Defendants owed Plaintiff and his children a duty to provide safe housing, conduct proper inspections, disclose hazards, and ensure timely remediation.

2. Defendants breached this duty through inadequate inspections, failure to disclose hazards, delayed repairs, and failure to coordinate with vendors.

3. Defendants' negligence directly and proximately caused physical, emotional, and economic harm to Plaintiff and his children.

Gross Negligence

1. Defendants' conduct was not merely negligent but demonstrated reckless disregard for the safety and well-being of Plaintiff and his children.

2. Defendants knowingly allowed unsafe conditions to persist, ignored repeated warnings, and failed to take corrective action despite clear evidence of harm.

3. Defendants' conduct constitutes gross negligence under applicable law.

Intentional or Reckless Infliction of Emotional Distress

1. Defendants engaged in extreme and outrageous conduct, including retaliatory communication restrictions, hostile treatment, insinuations of poor parenting, and dismissive responses to Plaintiff's humiliation during the law enforcement incident.

2. Defendants acted intentionally or with reckless disregard for the likelihood that their conduct would cause severe emotional distress to Plaintiff and his children.

3. As a result, Plaintiff and his children suffered severe emotional distress, including fear, anxiety, humiliation, and psychological harm.

Supervisory Liability and Discriminatory Climate

1. Senior state officials, including the Governor and Lieutenant Governor, created a discriminatory climate through public statements hostile toward Muslims, contributing to a foreseeable environment in which downstream actors engaged in discriminatory conduct.

2. Defendants operated within this climate and acted in ways consistent with the discriminatory posture established by state leadership.

3. Defendants' conduct, influenced by this discriminatory environment, violated Plaintiff's constitutional and statutory rights.

Jury Demand and Closing Statement

1. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

2. Plaintiff asserts that the issues presented in this action involve disputed questions of fact, credibility, intent, discrimination, retaliation, and constitutional violations that are properly resolved by a jury.

3. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

4. Plaintiff states that the harms described in this Complaint—including physical injury, emotional distress, economic loss, educational disruption, business interference, and violations of constitutional and statutory rights—are substantial, ongoing, and directly attributable to Defendants' actions and omissions.

5. Plaintiff further states that the cumulative impact of Defendants' conduct, combined with the discriminatory climate fostered by senior state officials, created a foreseeable environment in which the rights of Plaintiff and his minor children were violated.

6. Plaintiff respectfully requests that the Court grant all relief described in Section 5 of this Complaint, including declaratory relief, injunctive relief, compensatory damages, punitive damages where permitted, attorney's fees, costs, and any additional relief the Court deems just and proper.

7. Plaintiff affirms that this action is brought in good faith, supported by documented evidence, and filed for the purpose of securing justice, accountability, and protection of constitutional rights for himself and his minor children.

Verification and Attestation

1. I, Kurt Kalani Sparks, declare under penalty of perjury under the laws of the United States of America that the facts stated in this Complaint are true and correct to the best of my knowledge, information, and belief.

/s/ Kurt Kalani Sparks

Kurt Kalani Sparks

Plaintiff, Pro Se

128 North Colorado Avenue

Indianapolis, IN 46201

Phone: (317) 520-6662

Email: k.k.sparks@activesessiondefense.com

Date: 5/30/26

Kurt K Sparks
123 N. Colorado Ave
Indianapolis, IN
46201

Retail

U.S. POSTAGE PAID
FCM LG ENV
INDIANAPOLIS, IN 46201
JUN 01, 2026

46204

$4.44

RDC 99

R2305K135560-21

FILED
JUN 04 2026
U.S. DISTRICT COURT
INDIANAPOLIS, INDIANA

LEGAL MAIL

Office of the Clerk - Civil Intake
U.S. District Court
Southern District of Indiana
Birch Bayh Federal Bldg
U.S. Court House
46 E. Ohio Street
Indianapolis, IN 46204